# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 50374 | **DATE** | 4/23/2013 |
| **CASE TITLE** | The Advantage Group Foundation vs. McHenry County Mental Health Board, et al. | | |

**DOCKET ENTRY TEXT:**

For the reasons stated below, Counts I and III are dismissed with prejudice. Count II is dismissed without prejudice. The named board members and employees are dismissed as defendants per footnote 1. This case is terminated.

*Philip G. Reinhard*

■ [ For further details see text below.]

Electronic Notices.

## STATEMENT - OPINION

Plaintiff, The Advantage Group Foundation, brings this action against defendants, McHenry County Mental Health Board, its members (Terrance Ellis, Brett Wisnauski, Conee Meschini, Sam Tenuto, Mary Donner, Kathy Hintz, Don Larson, Kari Stinespring and James Swarthout), in their official capacities, and certain of its employees (Alexandria W. Lewis, Bob Lesser, Duane Lahti, Cathy Garrey and Wendy Neuman), in their official capacities,[1] alleging claims for deprivation of property without due process of law under 42 U.S.C. § 1983 (Count I), for declaratory judgment for breach of contract (Count II) and for violation of the Sherman Antitrust Act, 15 U.S.C. § 2, et seq. (Count III). Jurisdiction is premised on 28 U.S.C. § 1331. Defendant moves to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

The facts are taken from the complaint and the exhibits thereto. Defendant is a community mental health board established by the County of McHenry pursuant to the Illinois Community Mental Health Act, 405 ILCS 20/1 et seq. Defendant levies a tax for the purpose of providing community mental health facilities and services. Defendant received approximately $13 million in tax revenues in 2012 and also receives private and government grants to administer as it sees fit. Plaintiff is a provider of chemical dependency treatment services. Plaintiff and defendant entered a series of annual agreements for plaintiff to provide outpatient substance abuse treatment on a fee for service basis. Three agreements are attached as Exhibit 1 to the complaint. Each agreement has a commencement date of December 1 and an ending date of November 30 for the contract years 2008-09, 2009-10, and 2010-11. The agreements provide at paragraph 18: "BENEFITS COORDINATION. It is understood that the clients or [plaintiff] as assignee in the Services in Schedule B may be entitled to payment or reimbursement from third party sources such as Medicare, Medicaid, Social Security or private insurance benefits. The [plaintiff] shall make application and file claims for all such benefits that are available to the clients. [Defendant] shall be given credit for all direct client payments and third party payments or said payments shall be applied to the Services in accordance with applicable Federal, State, and [defendant] rules, regulations, and policies.

"[Defendant] is a third party/other governmental payor and may perform audits or review of benefits to determine [plaintiff's] compliance with third party benefits coordination of the Services funded by this Agreement. . . . In the event that coordination of benefits results in payments totaling more than [plaintiff's] total cost of service delivery, [defendant] reserves the right to request a reimbursement of the amount in excess of the cost of service

delivery or [defendant's] payment, whichever is less." The agreement also required plaintiff "if subject to Medicaid certification and applicable rules as specified herein, shall be in compliance with the coordination of benefits requirements of the applicable rules."

Paragraph 14 of the agreements provides: "SERVICE REVIEW AND PROCEDURE ON NON-COMPLIANCE. [Defendant] has the right to review, audit, monitor and evaluate all of the funded Services and billing reports administered by [plaintiff.] [Defendant] may apply an extrapolation processes (sic) if in the sole judgment of [defendant,] billing errors, unsubstantiated billings or documentation deficiencies are in [defendant's] opinion, significant. If [defendant] determines that [plaintiff] is not in compliance with the terms of this Agreement, relevant Federal, State, or Local laws, rules, regulations, or with the policies, rules, and regulations of [defendant,] the following procedure shall be followed:

"[Plaintiff] shall be notified in writing of its non-compliance and requested to meet with the Executive Director of [defendant] in an effort to reach a satisfactory agreement.

"In the event [plaintiff] and the Executive Director of [defendant] are unable to reach a satisfactory agreement within 10 days, the payment of all funds under the Agreement may be suspended by [defendant] and the following procedures shall be followed:

[Defendant] and [plaintiff's] Board of Directors shall meet . . . within 30 days following the notification of suspension of funds. In the event [plaintiff] is unwilling to meet the specified requirements of [defendant] within said 30 day period, [defendant] reserves the right to withhold a portion or all funds heretofore committed to [plaintiff] in this Agreement. In the event the funds are withheld, they shall, at the option of [defendant,] be: (a) Placed in escrow until [plaintiff] is in compliance; or (b) Used to contract with another party to provide similar services; or (c) Returned to the Mental Health Fund to be used for future liabilities of [defendant] for like or similar Services."

Paragraph 16 of the agreements provides: "REPAYMENT. . . . [Plaintiff] shall also repay to [defendant] all or any portion of the funds received under this Agreement if [defendant] determines after notice and a hearing that [plaintiff] has failed to provide the services and Services for which the funds were paid under this Agreement, or [plaintiff] has applied the funds for purposes inconsistent with this Agreement.

[Plaintiff] shall repay to [defendant] all payments for services that have already been paid by any federal, state or local agency either prior to or after a [defendant] payment."

At some point, defendant assembled an audit team and, on March 12, 2012, defendant conducted an audit of plaintiff which involved reviewing sixteen randomly selected patient files taken from records between 2008 and 2011. On July 25, 2012, the audit team examined financial documentation, billings, and sources of funding on these same sixteen files. On August 30, 2012, defendant adopted an "Audit and Appeals Policy and Procedure." On September 4, 2012, defendant issued an "Initial Audit Report" ("Report"). The Report found that for each of the sixteen files examined that "Coordination of Benefits was not applied to billing." The Report concluded "multiple funders have been billed and paid for the same hours of service," "[plaintiff] collected more than its stated charges for service, with no evidence that any of the payers were reimbursed" and that "service recipients were covered by Medicaid and those services were billed to both Medicaid and [defendant] with no evidence [plaintiff] refunded the overpayments or reported the billing errors to Medicaid or [defendant]." According to the Report plaintiff's "representatives indicated case management notes and summary notes accounted for [plaintiff's] staff's documentation time. Staff clinical records documentation time is not reimbursable activity under the [agreements]." Improper billing for documentation time was noted for all sixteen files examined.

Since 100% of the files reviewed were found not to have had coordination of benefits applied and to have had documentation time improperly billed, using extrapolation, the Report found all fee for service billings submitted by plaintiff to defendant to be subject to recoupment for the years 2009, 2010, and 2011. The total recoupment amount noted in the Report was $1,083,817.65.

Defendant demanded plaintiff respond to the Report on or before October 15, 2012. Plaintiff filed this lawsuit on October 12, 2012.

A procedural due process violation claim requires "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." Khan v. Bland, 630 F.3d 519, 527 (7th Cir. 2010) (internal quotation marks and citation omitted). "For purposes of a due process claim, property interests are created and defined by an independent source such as a contract or state law." Gen. Auto Serv. Station v. City of Chicago, 526 F.3d 991, 1000 (7th Cir. 2008).

**STATEMENT - OPINION**

Plaintiff alleges in its complaint that it has "a fundamental property right to perform services, treatment, and therapy work which comprise its business and to freely and fairly compete with other similarly situated agencies for patient business and funding offered through the State via DASA [Department of Alcohol and Substance Abuse] and the County via [defendant];" that it has "a fundamental property right to perform and compete for the services performed and funded through the AGREEMENTS in a manner equivalent to like providers;" and that it has a "fundamental property right to perform and compete for the services performed and funded through its contract with DASA, and in its expectation that it can perform under that contract without the intentional and unjustified interference of the DEFENDANT who's staff has questioned and urged DASA to reconsider and reverse its prior audit results finding [plaintiff] to be in complete compliance." In its brief, plaintiff says it "is seeking the ability to compete without the unjustifiably capricious and destructive interference of DEFENDANT, and to retain the funds it garnered providing mental health treatment services to the citizens of McHenry County."

Plaintiff's right to payment for services provided under the agreements is likely a protected property interest. Khan, 630 F.3d at 529. However, the complaint does not allege deprivation of these payments. Defendant conducted an audit and seeks recoupment of payments made. However, plaintiff still has the money. The complaint does not allege defendant is refusing to pay plaintiff amounts earned under the agreements. It alleges defendant wants the money it already paid back. To get it, unless plaintiff pays voluntarily, defendant will have to file a lawsuit to establish its right to recoupment, obtain a judgment, and then collect the judgment. The state court proceeding defendant would have to bring to regain the money already paid to plaintiff would provide due process. The audit and demand for recoupment have not deprived plaintiff of anything.

Plaintiff also alleges it has a fundamental property right to compete for funding from the defendant. "A property interest of constitutional magnitude exists only when the state's discretion is 'clearly limited' such that plaintiff cannot be denied the interest unless specific conditions are met." Id. at 526 (internal quotation marks and citation omitted). Plaintiff does not point to anything in the statute under which defendant operates that limits defendant's discretion in deciding with whom to contract. Plaintiff does not allege the statute provides plaintiff is entitled to contract with defendant "unless specific conditions are met." Plaintiff, therefore, has no protected property interest in obtaining future contracts with defendant.

Plaintiff's other allegations relate to its relationship with DASA, another source of plaintiff's funding, and defendant's interference with that relationship. However, the complaint does not allege defendant's actions in this regard resulted in DASA withholding any payments due plaintiff from DASA. In fact, it alleges DASA has always found plaintiff to be in compliance with its rules. Further, defendant is not alleged to control DASA. Any funding decisions by DASA would be made by DASA. Defendant encouraging DASA not to fund plaintiff does not itself work a deprivation of anything. Plaintiff has failed to allege a deprivation of a protected property interest. Count I must be dismissed.

Count III posits a Sherman Act violation. Plaintiff contends defendant's actions were anticompetitive in nature and constitute an antitrust violation. Defendant counters its actions are covered by the "state action" exemption to federal antitrust law and that, in any event, it did not engage in any anti-competitive behavior.

"[W]hen a local government entity acts pursuant to a clearly articulated and affirmatively expressed state policy to displace competition, it is exempt from scrutiny under the federal antitrust laws." Federal Trade Commission v. Phoebe Putney Health Systems, Inc., No. 11-1160, 2013 WL 598434, * 3 (U.S. Feb. 19, 2013). This is the state-action immunity doctrine. Id. "[A] state legislature need not expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." Id. at * 7 (internal quotation marks and citation omitted). The clear-articulation test is met "if the anticompetitive effect was the 'foreseeable result' of what the State authorized." Id.

Illinois provides that any county (as well as other local governmental entities) "shall have the power to construct, repair, operate, maintain and regulate community mental health facilities to provide mental health services as defined by the local community mental health board, including services for, persons with a developmental disability, or substance abuse disorder, for residents thereof and/or to contract therefore with any private or public entity which provides such facilities and services." 405 ILCS 20/2. Illinois provides for the creation of community mental health boards to carry out this authority, 405 ILCS 20/3a, and states that a community mental health board, like defendant, "shall make rules and regulations concerning the rendition or operation of services and facilities which it directs, supervises, or funds." 405 ILCS 20/3e(1). The community mental health board "may enter into multiple-year

contracts for rendition or operation of services, facilities and educational programs." 405 ILCS 20/3e(2)(a).

<u>Active Disposal, Inc. v. City of Darien</u>, No. 09 C 2930, 2010 WL 1416461 (N.D. Ill. Mar. 31, 2010) (Kennelly, J.) dealt with the question of state-action immunity in examining similar statutory language concerning garbage contracting. 65 ILCS 5/11-19-1(a), at issue in <u>Active Disposal</u>, provided "that '[a]ny city, village or incorporated town may make contracts . . . with any person, corporation, or county . . . for more than one year and not exceeding 30 years relating to the collection and final disposition, or relating solely to either the collection or final disposition of garbage, refuse and ashes.'" <u>Active Disposal</u>, 2010 WL 1416461 at * 5. The defendant municipalities, pursuant to the authority of this statute, adopted ordinances establishing exclusive hauling contracts for "roll off" containers. The court found the ordinances establishing the exclusive contracts were "a foreseeable result of the authority granted by the Illinois legislature in section 1 of the statute" and, therefore, fell within the state-action exemption. <u>Id.</u> at * 6. The statute clearly allowed municipalities to enter such contracts. <u>Id.</u>

Similarly, the statute here allows defendant to "contract with any private or public entity which provides such facilities or services," 405 ILCS 20/2, and to enter into contracts "for rendition or operation of services, facilities and educational programs." 405 ILCS 20/3e(2)(a). Plaintiff was one of the entities contracted by defendant for the provision of such services. It is foreseeable from a statutory grant of authority to enter contracts with providers and to "make rules and regulations concerning the rendition or operation of services and facilities which it directs, supervises, or funds," 405 ILCS 20/3e(1), that a community mental health board would select among various possible providers and that some would get contracts, some would not, and that changes in which providers would get contracts would change over time. Because defendant's actions were foreseeable under the statutory grant of authority, plaintiff's Sherman Act claims are barred by the state-action immunity doctrine.

<u>Phoebe Putney</u> does not compel a different result. <u>Phoebe Putney</u> held that the Georgia law creating hospital authorities "had not clearly articulated and affirmatively expressed a policy to allow hospital authorities to make acquisitions that substantially lessen competition." <u>Phoebe Putney</u>, 2013 WL 598434 at * 12. Here, defendant is serving simply as a source of funding for providers of mental health services. A function the statute clearly authorizes and from which it is foreseeable that defendant would make choices among providers to fund.

Count II seeks a declaratory judgment that defendant's actions in instituting the audits were a breach of contract and seeks damages for the breach. This is a state law claim. Because all federal claims are being dismissed, the court declines to exercise supplemental jurisdiction over the claims in Count II. 28 U.S.C. § 1367(c)(3).

For the foregoing reasons, Counts I and III are dismissed with prejudice. Count II is dismissed without prejudice. The named board members and employees are dismissed as defendants per footnote 1. This case is terminated.

---

1. The board members and employees are named only in their official capacities. Where the governmental entity is also named, this is redundant. <u>Smith v. Metropolitan School Dist. Perry Township</u>, 128 F.3d 1014, 1021, n.3 (7th Cir. 1997). The board members and employees are dismissed as defendants. Use of "defendant" herein will mean the McHenry County Mental Health Board only.